UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Weston J. Stow

v.                                          Civil No. 1:18-cv-768-JL
                                            Opinion No. 2022 DNH 025
Dr. Anne Davis

**MEMORANDUM ORDER**

In this prisoner civil rights case, plaintiff Weston Stow contends that by reviewing his letter to a third party, and writing a disciplinary report against him for statements made in that letter, defendant and then-prison employee Dr. Anne Davis engaged in unlawful censorship in violation of Stow's First Amendment rights.  He also asserts claims against Dr. Davis under New Hampshire law for negligence, negligence per se, malfeasance in public office, and misfeasance in public office.  This court has jurisdiction over Stow's federal claim under 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367(a).

Dr. Davis moves for summary judgment on Stow's claims, arguing that Dr. Davis' actions are not censorship as a matter of law, and even if they could be considered censorship, her actions were justified.  Dr. Davis also argues that qualified immunity shields her from liability.  And she contends that if Stow's single federal claim is dismissed, the court should decline to exercise supplemental jurisdiction over his state law claims.  After consideration of the parties' submissions and hearing oral argument, the court grants the motion.  Dr. Davis' disciplinary report, which was quickly resolved without a guilty finding or any punishment against Stow, is not an act of censorship.  Even if it was censorship, however, Dr. Davis' actions furthered the substantial governmental and penological interests of security, rehabilitation, prevention of crime, and protection of the public and were sufficiently tailored to furthering those interests, such that her actions were justified and did not violate Stow's constitutional

rights.  In the absence of a federal claim and without any other independent basis for federal court jurisdiction, the court declines to continue exercising supplemental jurisdiction over Stow's remaining state law claims.

## I.     Applicable legal standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial by a rational fact-finder, and "material" if it could sway the outcome under applicable law. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving party." Id.

Where, as here, the plaintiff bears the ultimate burden of proof, once the movant has made the requisite showing, he can no longer "rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." Torres–Martínez v. P.R. Dep't of Corr., 485 F.3d 19, 22 (1st Cir. 2007).  That is, the plaintiff "'may not rest upon the mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue' of material fact as to each issue upon which [he] would bear the ultimate burden of proof at trial." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52–53 (1st Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

## II.     Background

The following facts are undisputed, unless otherwise noted.  See L.R. 56.1(b) ("All properly supported material facts set forth in the moving party's factual statement may be

deemed admitted unless properly opposed by the adverse party.").  Stow is an inmate in the custody of the New Hampshire Department of Corrections.  On October 25, 2017, while incarcerated, Stow wrote a letter to Roger Goodell, the Commissioner of the National Football League.  The gist of the letter was that Stow was unhappy with the actions of NFL players electing not to stand during the pre-game playing of the National Anthem and wanted to express this displeasure to the League's Commissioner.  In the letter, Stow quoted from a movie line in which a character says "your [sic] going to acquire courage or I'm going to stick this steel leg of mine up your ass – you feel me," and told the Commissioner that this "message" applies to him, "only it will be the public that sticks a negative balance sheet up your ass."[1]

At the time Stow wrote his letter to Goodell, New Hampshire DOC's "Policy and Procedure Directive" 5.25 provided that "[i]t [was] the policy of the Department of Corrections to require all staff to report any and all occurrences of intelligence interest and incidents of inmate misconduct by writing a thorough, accurate, concise[,] and timely report."[2]  PPD 5.25 further directed all staff members:

> to prepare reports when they have reason to believe that an inmate has engaged in punishable conduct. This may be done in one of two ways: the staff member may serve the inmate with a 'Negative Spot Report[,]' or a disciplinary report may be submitted to the Program Coordinator/Unit Manager/Captain/designee of the inmate's living unit.[3]

---

[1] See Stow Letter (doc. no. 24-1).

[2] PPD 5.25 (doc. no. 66-2) at ¶ III.  Dr. Davis' summary judgment motion gave the impression that this PPD has been updated since October 2017.  The court thus refers to it in the past tense.

[3] PPD 5.25 at ¶ IV, C, 1.  Staff members submit disciplinary reports "to report disciplinary infractions on the part of inmates who fail to follow the rules and an oral counseling session or a negative spot report is considered inadequate due to the importance, severity, or repetitiveness of the violation"  Id. at ¶ IV, A, 2.

PPD 5.25 detailed the procedures related to the processing of a disciplinary report submitted by a staff member.  The act of submitting the disciplinary report triggered a process of "review and investigation" of the reported facts.  PPD 5.25 also listed the possible recommendations following completion of a preliminary investigation, which included:  (1) dismissing the case as not being worthy of further action; (2) reducing the disciplinary report to a spot, incident report, or other lower level more appropriate for the offense; (3) upgrading the report to a major violation for cause; (4) filing the report without prejudice; and (5) referring the matter to a disciplinary hearing.[4]  PPD 5.25 further included a list of prohibited and potentially punishable inmate conduct.  One type of offense on the list – "Offense 6" – prohibited inmates from "[t]hreatening any person with harm, either to person or property."[5]

Prior to mailing his letter to Commissioner Goodell, Stow asked DOC employee Rhianne Snyder to make him a photocopy of the letter and its attachments.  Ms. Snyder found the letter and materials questionable and sent copies to New Hampshire State Prison Librarian John Perkins for review.  Mr. Perkins then provided a copy of the letter to Dr. Davis, who was then the DOC's Director of Education, for review.[6]  Dr. Davis reviewed the letter on October 31, 2017.  At that time, Dr. Davis was aware of PPD 5.25 and the list of prohibited inmate conduct, including Offense 6.  She felt that Stow's letter could be construed as a threat to harm someone or as a figurative expression that did not rise to the level of a threat of actual harm.  Given this perceived ambiguous interpretation, Dr. Davis contacted DOC security staff for guidance, and

---

[4] Id. at ¶ IV, C, 3, o.

[5] Attachment to PPD 5.25 (doc. no. 66-2).

[6] See Disciplinary Report (doc. no. 24-2).  The court draws these facts from Dr. Davis' declaration and the disciplinary report itself.  See doc. no. 24-2.  Neither party challenges the authenticity of the disciplinary report.

based on this guidance, she decided to submit a disciplinary report for review so that the matter could be investigated to determine if Stow had committed a punishable offense.  Dr. Davis accordingly wrote a disciplinary report against Stow, charging him with violating Offense 6 of PPD 5.25.  The disciplinary report was filed without prejudice to Stow.  Because there was no guilty finding, DOC imposed no sanctions against Stow as a result of the disciplinary report.  Dr. Davis' actions also did not delay or prevent Stow from mailing the letter out of the prison.

Stow originally filed suit against Dr. Davis on August 23, 2018.  After two rounds of preliminary review[7] by Judge Johnstone, one federal claim and four state law claims remain against Dr. Davis, which are set for trial in April 2022. [8]

## III.   <u>Analysis</u>

### A.   **First Amendment censorship**

Dr. Davis seeks summary judgment on three independent grounds.  First, she argues that she did not censor Stow's communication.  Second, she argues that even if the court considers her actions censorship, substantial penological interests justified the censorship, and the censorship was appropriately tailored to advancing those interests.  And third, Dr. Davis contends that, even if the court found a constitutional violation, she otherwise enjoys qualified immunity against Stow's claim.  The court addresses each argument in turn.

---

[7] <u>See</u> 28 U.S.C. § 1915(a) and LR 4.3(d)(1) (outlining process for preliminary review by Magistrate Judge).

[8] <u>See</u> Report and Recommendation (doc. no. 25); <u>see also</u> Complaint and Amended Complaint (doc. nos. 1 and 24).  Judge Johnstone construed Stow's complaints as asserting eight claims, with several claims including multiple sub-parts or sub-claims.  Stow did not object to her Report and Recommendation (<u>see</u> doc. 31), so the court adopts the construction and list of claims set forth in that order.

1.      **Act of censorship**

The First Amendment of the United States Constitution provides inmates with the right to

send and receive mail without "unjustified governmental interference with the intended

communication." Procunier v. Martinez, 416 U.S. 396, 409 (1974), overruled in part by

Thornburgh v. Abbott, 490 U.S. 401 (1989).[9]  Such interference, often referred to as censorship,

can be direct or indirect.  Direct censorship may involve "the excising of certain portions of

written correspondence, or the withholding of delivery of a piece of mail." Minnesota Civil

Liberties Union v. Schoen, 448 F. Supp. 960, 965 (D. Minn. 1977).  "Indirect censorship is a

'chilling' of the content of written correspondence; it involves a reluctance on the part of the

communicating parties to include certain communication in written correspondence because of

the knowledge that such written correspondence may be read by other parties." Id. at 965-66

(citing Procunier, 416 U.S. at 423-27 (Marshall, J., concurring)).  Here, it is undisputed that Dr.

Davis neither excised any portions of Stow's letter nor withheld or otherwise delayed its

delivery, so direct censorship is not at issue.  The relevant question is whether Dr. Davis' actions

constituted indirect censorship.

Inspecting, reading, or perusing an inmate's outgoing non-legal mail generally is not

censorship. See, e.g., Wolff v. McDonnell, 418 U.S. 539, 576 (1974) ("freedom from censorship

is not equivalent to freedom from inspection or perusal"); Busby v. Dretke, 359 F.3d 708, 722

(5th Cir. 2004) ("The Supreme Court has never held that reading inmate [non-legal] mail violates

the First Amendment."); United States v. Whalen, 940 F.2d 1027, 1035 (7th Cir. 1991) ("[I]t is

---

[9] The Thornburgh court held that Martinez established the standard for prison practices affecting
outgoing inmate mail, but that Turner v. Safley, 482 U.S. 78 (1987) established the standard for
practices affecting incoming inmate mail.  To the extent that Martinez addressed incoming
correspondence, Thornburgh overruled Martinez, but Martinez's standard, as applied to outgoing
mail, remains good law.  Thornburgh, 490 U.S. at 413.

well established that prisons have sound reasons for reading the outgoing mail of their inmates"). Dr. Davis therefore did not censor Stow's letter by reading or inspecting it.

Dr. Davis argues that her decision to file a disciplinary report against Stow based on the letter similarly cannot constitute indirect censorship. She reasons that in the cases involving disciplinary reports arising from the contents of prison mail, the courts found censorship only where the disciplinary report resulted in sanctions or punishment for the inmate.

Dr. Davis appears to be correct. What distinguishes those cases from Stow's situation is that the institution punished the inmates in some way. See, e.g., Barrett v. Belleque, 544 F.3d 1060, 1061 (9th Cir. 2008) (punishment for outgoing mail "resulting in a loss of good time, revocation of certain privileges, and other punitive measures"); Gandy v. Ortiz, 122 F. App'x. 421, 422 (10th Cir. 2005) (inmate "sanctioned with ten days of punitive segregation, suspended from his paid work assignment, and, he asserts, further sanctioned with an increase in his security classification and transfer to a higher-security facility, which resulted in the loss of some of his personal property"); Loggins v. Delo, 999 F.2d 364, 365 (8th Cir. 1993) ("Holman filed a conduct violation report based on the contents of the letter. Loggins was found guilty of violating Rule 21 and was sentenced to ten days disciplinary detention."); Todaro v. Bowman, 872 F.2d 43, 44 (3d Cir. 1989) (three-day confinement in punitive segregation and higher security designation in retaliation for mailing letters); Brooks v. Andolina, 826 F.2d 1266, 1267 (3d Cir. 1987) (disciplinary charges, hearing, lack of due process and procedural safeguards for inmate at hearing, guilty finding, and punishment of thirty days punitive segregation); Santiago v. Rabideau, No. 15 C 1856, 2016 WL 4490578, at *1 (N.D. Ill. Aug. 23, 2016) (disciplinary

report, hearing, guilty finding, and punishment involving transfer to "disciplinary segregation unit" for one month).[10]

Such punishments or sanctions, resulting in some actual deprivation of the inmate's rights, would indeed have a "chilling" effect on the inmate and cause a reluctance to include certain content in their written correspondence.  The same cannot be said here, where, in addition to suffering no punishment as a result of Dr. Davis' report, Stow was not even required to respond to the report.  DOC also did not investigate the report, hold a hearing, recommend a guilty finding or potential punishment, and ultimately, rather than find Stow guilty of the charge, DOC instead filed the report away without prejudice to Stow.

Stow has not offered, and the court's research has not uncovered, any case in which the filing of a disciplinary report that does not result in punishment to the inmate can constitute actionable indirect censorship.  He nevertheless argues that Dr. Davis' disciplinary report amounted to censorship because it may negatively affect him in the future and thus has a chilling effect on his exercise of free speech rights.  Specifically, he contends that because the report will remain in his permanent inmate record, it could impact his eligibility for parole or his inmate classification.  See Cor. 407.10 (f)(1) (change in disciplinary record may trigger a reclassification evaluation); Par. 301.03(h)(1) (inmate's disciplinary record during incarceration is one of many factors/criteria for determining an inmate's probability of success on parole); see also Taylor v. Sterrett, 532 F.2d 462, 469 (5th Cir. 1976) (recognizing that a prisoner may be "denied effective communication" by an "indirect chilling of the content" of their letters).  Stow acknowledged at

---

[10] Dr. Davis unsuccessfully moved to dismiss Stow's censorship claim on similar, but less developed grounds, as those advanced in her motion for summary judgment.  The court did not draw the distinction between filing a disciplinary report and imposing punishment or sanctions in its order on the motion to dismiss (doc. no. 47) because Dr. Davis neither developed this argument nor framed it in that manner in her motion to dismiss.

oral argument, however, that Dr. Davis' disciplinary report has not affected his inmate classification or eligibility for parole.  And the 60-day period for DOC to bring the report forward and re-open it for investigation has long passed.

Dr. Davis responds that a disciplinary report without any punishment is a de minimis intrusion because it would not chill or silence a person of ordinary firmness from future First Amendment activities, particularly where, as here, the inmate has an opportunity to defend himself against the charge.  See Dr. Davis' Mem. of Law (doc. no. 66-1) (citing Starr v. Dube, 334 Fed. Appx. 341 (1st Cir. 2009)); see also Pope v. Bernard, No. 10-1443, 2011 WL 478055, at *2 (1st Cir. Feb. 10, 2011) (per curiam) (ruling that an adverse action must be "more than de minimis," which means that "it 'would chill or silence a person of ordinary firmness from future First Amendment activities'" (quoting Morris v. Powell, 449 F.3d 682, 685 (5th Cir. 2006))). Dr. Davis relies primarily on Starr v. Dube for this argument, and while Starr involved a retaliatory discipline claim, which has different elements of proof than a censorship claim, the parties agree that the dispositive question in both types of cases is the same: would the prison's adverse action chill or deter a prisoner of ordinary firmness from engaging in future activities protected by the First Amendment?[11]

In Starr, the First Circuit Court of Appeals held that filing a false disciplinary charge against an inmate, which was dismissed after a hearing and brief investigation, was not the type of adverse act that would deter a person of ordinary firmness from exercising his constitutional rights in the future.  334 Fed. Appx. at 342.  The court rejected the inmate's argument (which was nearly identical to Stow's) that "the filing of the disciplinary charge against him met [the

---

[11] Indeed, both parties cite case law from the retaliatory discipline context in support of their arguments relating to the question of whether Dr. Davis' actions constituted indirect censorship.

'ordinary firmness' standard] because it exposed him to maximum penalties that included punitive segregation and a loss of good time credits." Id. at 342-43.  It reasoned that because prison policy afforded Starr with the opportunity to defend himself against the charges, and at his disciplinary hearing, Starr successfully defended himself and obtained a dismissal of the charges, the policy sufficiently protected inmates from "the threat of punishment that is posed by a retaliatory disciplinary charge." Id. at 343.

Prison policy affords Stow the same procedural safeguards here.  Indeed, unlike the inmate in Starr, Stow did not need to employ these safeguards because the facility chose not to investigate the charge and filed it without prejudice or punishment to Stow.  Stow has likewise conceded that the disciplinary report in his file has had any negative consequences, or any consequences whatsoever, on his inmate classification,[12] eligibility for parole, or other inmate privileges.  Based on these undisputed facts, and following First Circuit Court of Appeals precedent as it must, the court finds that no "reasonable fact-finder could conclude that inmates of 'ordinary firmness' would be deterred from continuing to exercise their constitutional rights merely because of the filing of a disciplinary charge carrying potentially severe sanctions." Id.; see also Bridges v. Gilbert, 557 F.3d 541, 555 (7th Cir. 2009) ("A single retaliatory disciplinary charge that is later dismissed is insufficient to serve as the basis of a § 1983 action.") (citing Bart, 677 F.2d at 625 ("A tort to be actionable requires injury. It would trivialize the First

---

[12] Even if Stow had evidence that Dr. Davis' report somehow affected his inmate classification, the court is skeptical that a jury would elevate such a consequence beyond a de minimis intrusion.  See Hewitt v. Helms, 459 U.S. 460, 467-68 (1983) (noting that changing an inmate's prison classification generally does not deprive him of liberty and observing that "there is no constitutional or inherent right to parole, and the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison, despite the undoubted impact of such credits on the freedom of inmates") (quotation marks and citations omitted), overruled, in part, on other grounds by Sandin v. Conner, 515 U.S. 472 (1995).

Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise."); Davis v. Goord, 320 F.3d 346, 351 (2d Cir.2003) (observing that "an isolated incident of mail tampering is usually insufficient to establish a constitutional violation") (citations omitted).  As Stow cannot establish as a matter of law that Dr. Davis engaged in censorship, she is entitled to summary judgment on Stow's lone federal claim.

### 2.    Justification

Even if the court assumes, for purposes of deciding this motion, that Dr. Davis censored Stow, she would still be entitled to summary judgment on this claim because the alleged censorship was justified.  An inmate's right to send and receive non-legal mail without censorship is not unlimited.  "[C]ensorship of prisoner mail is justified if the following criteria are met." Procunier, 416 U.S. at 413-14.  "First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." Id. at 413.  The act of censorship must "further[] one or more of the substantial governmental interests of security, order, and rehabilitation." Id.  In addition, "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." Id.  Even a "restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad." Id. at 413-14.

Dr. Davis states that she filed the disciplinary report because she believed it may have included a threat to another person, and DOC policy required her to report her suspicion.  She contends that her actions and DOC's PPD 5.25's prohibition against threatening inmate conduct furthered DOC's substantial interests in maintaining the safety and security of its facilities and

rehabilitating inmates.  The court agrees with Dr. Davis and the reasoning of the cases cited in her brief upholding prison policies restricting threatening conduct.  See, e.g., Lane v. Salazar, 911 F.3d 942, 945-948 (9th Cir. 2018); Almeida v. Wall, C.A. No. 08-184S, 2008 WL 5377924, at *8 (D.R.I. Dec. 23, 2008); Allah v. Greiner, No. 03 Civ. 3789(NRB), 2004 WL 1713811, at *6 (S.D.N.Y. July 29, 2004).

The court further finds that Dr. Davis' actions furthered the important government interests of deterrence of crime and protection of the public.  See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) ("The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives--including deterrence of crime, rehabilitation of prisoners, and institutional security."); O'Keefe v. Van Boening, 82 F.3d 322, 326 (9th Cir. 1996) ("[T]he prevention of criminal activity and the maintenance of prison security are legitimate penological interests which justify the regulation of both incoming and outgoing prisoner mail"); Perry v. Sec'y, Fla. Dep't of Corr., 664 F.3d 1359, 1366 (11th Cir. 2011) ("Therefore, the FDOC has shown a rational relationship between the legitimate penological interests of protecting the public and ensuring internal prison security and the Rule prohibiting inmates from soliciting for pen pals.").

Stow argues that no rational jury could find that Dr. Davis' actions furthered these interests because no reasonable person would have deemed the language in his letter a true threat of bodily harm.  While Stow is correct that many reasonable people would construe his letter as a "figurative" threat to Commissioner Goodell, it was not unreasonable for Dr. Davis to construe it as an actual threat.  Nor is it the court's role to adjudicate the merits of Dr. Davis' disciplinary report where, as here, there is no evidence of a retaliatory motive or otherwise improper basis for

filing the report.[13]  While prison officials "may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements," there is no evidence of such intent here, and Stow's unsupported contention that Dr. Davis acted with "malice" is not evidence.  Moreover, when correspondence contains more than unwelcome opinions and includes content that arguably constitutes threats of harm, prison officials may react as they deem reasonably appropriate, within constitutional bounds.  Martinez, 416 U.S. at 413.

If the court had to address the justification question, it would also find that Dr. Davis' submission of the disciplinary report according to DOC policy was no greater than necessary to protect the governmental interests at stake.  The disciplinary report triggered an investigatory process that included procedural safeguards to protect the accused inmate.  See Martinez, 416 U.S. at 417 ("the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards").  If the matter advanced beyond what happened here and prison officials held a hearing on the report, Stow would have been entitled to additional safeguards at the hearing, as well as the right to appeal any adverse decision.  Further, while Dr. Davis could have refrained from filing the report, the act of censorship need not be the "least restrictive means" of furthering the governmental interests.  Thornburgh, 490 U.S. at 410; see also Turner, 482 U.S. at 89-90 (rejecting "least restrictive alternative" requirement out of concern that "every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand").  Dr. Davis' actions were therefore not unnecessarily broad and, to the extent that she engaged in censorship, such censorship was justified and entitled to deference.  See Turner, 482 U.S. at 89

---

[13] Magistrate Judge Johnstone dismissed Stow's retaliatory discipline claim as part of her preliminary review.  See doc. nos. 12 and 25.

("prison administrators . . . and not the courts" are best suited "to make the difficult judgments

concerning institutional operations") (quoting Jones v. North Carolina Prisoners' Union, 433

U.S. 119, 128 (1977)); Avery v. Powell, 806 F. Supp. 7, 9 (D.N.H. 1992) ("Courts should afford

considerable deference to the determinations of prison administrators.").[14]

### 3.    Qualified Immunity

Dr. Davis also argues that she enjoys qualified immunity from Stow's censorship claim.

The court only reaches the qualified immunity question if it has found, or if it is possible a jury

will find, a constitutional violation.  As discussed above, however, the court finds as a matter of

law that Dr. Davis did not censor Stow or otherwise violate his constitutional rights.  The court

therefore need not determine whether Dr. Davis is qualifiedly immune from Stow's claims.  Had

it reached that question, however, the court would have found that Dr. Davis did not violate a

"clearly established" constitutional right because the "the law was [not] sufficiently clear that

every reasonable [prison] official would understand that what [she] is doing is unlawful."

District of Columbia v. Wesby, 138 S. Ct. 577 (2018).[15]

---

[14] Stow argues that Dr. Davis' actions were unjustified because she violated DOC policy on review of incoming and outgoing inmate "correspondence, publications, and property" and incoming and outgoing mail.  See Ex. A-1 to Complaint (doc. no. 1-6).  It does not appear that this policy relating to outgoing "mail" even applies here because Stow's letter was not "mail" at the time Dr. Davis reviewed it.  But even assuming, without deciding, that Dr. Davis violated PPD 5.26, such a violation does not override her reporting obligations under PPD 5.25 and, more importantly, does not have any bearing on Stow's constitutional claim.  See McFaul v. Valenzuela, 684 F.3d 564, 579 (5th Cir. 2012) ("An assertion that prison officials failed to follow prison rules or policies does not set forth a constitutional claim."); Grenning v. Klemme, 34 F. Supp. 3d 1144, 1155 (E.D. Wash. 2014) ("Moreover, even if the officials did not follow prison policy, this does not, in itself, amount to a constitutional violation.") (citing Cousins v. Lockyer, 568 F.3d 1063, 1070 (9th Cir. 2009)).

[15] Stow appears to argue that a prison official is not entitled to qualified immunity if her actions violate prison policy or some other rule.  That argument is without merit and the case Stow cites in support of it actually stands for the opposite proposition.  See Davis v. Scherer, 468 U.S. 183,

**B.**     **Supplemental Jurisdiction**

Lastly, Dr. Davis asks the court to decline to exercise supplemental jurisdiction over Stow's four state law claims in the event it dismisses his lone federal claim.  The court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  "As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims." Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995); see also Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, . . . the state [law] claims should be dismissed as well.").  In those circumstances, "the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); see also Wright & Miller, 13D Fed. Prac. & Proc. Juris. § 3567.3 n. 72 (3d ed.) (collecting a legion of cases in which courts declined to exercise supplemental jurisdiction after dismissing federal claims).

While this case is not necessarily in the early stages, Dr. Davis moved for summary judgment over four months before trial and, based on the parties briefing and exhibits, it does not appear that Stow has conducted discovery or meaningfully prosecuted his state law claims.  In fact, the legal and factual bases for these claims are unclear, and his amended complaint only alleges in a conclusory fashion that Dr. Davis' actions "constituted" negligence, misfeasance,

---

194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.").

and malfeasance.[16]  Nor has the court invested substantial judicial resources on the supplemental claims.  Under these circumstances, the court exercises its discretion and finds that the balance of factors weighs in favor of declining jurisdiction over Stow's state law claims.  Those claims are therefore dismissed without prejudice.[17]

### C.    Stow's Motion to Amend

While Dr. Davis' summary judgment motion was pending, Stow filed a motion to amend his complaint to add a claim for malicious prosecution.  Dr. Davis objects.  The court denies the motion in part because it is declining to exercise supplemental jurisdiction over Stow's existing state law claims.  Moreover, for the reasons stated in Dr. Davis' objection, the court finds that Stow's proposed malicious prosecution claim would be futile and accordingly denies his motion to amend for that reason, as well.

### IV.    <u>Conclusion</u>

For the reasons set forth above, Dr. Davis' motion for summary judgment[18] is GRANTED and Stow's motion to amend[19] is DENIED.  The clerk shall enter judgment accordingly and close the case.

---

[16] Doc. no. 24, at 4.

[17] If Stow elects to file his now-dismissed state law claims in state court, the statute of limitations on those claims, which has been tolled during the pendency of this lawsuit, will be tolled for an additional period of 30 days following the date of this order, or a longer period if state law permits.  <u>See</u> 28 U.S.C. 1367(d).

[18] Doc. no. 66.

[19] Doc. no. 72.

**SO ORDERED**.

_____
Joseph N. Laplante
United States District Judge

Dated:  March 9, 2022

cc:     Weston P. Stow, pro se
        Nathan W. Kenison-Marvin, Esq.
        Samuel R. V. Garland, Esq.